USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

STARWOOD HOTELS & RESORTS WORLDWIDE, INC.,

        Plaintiff,

v.

HILTON HOTELS CORPORATION N/K/A HILTON WORLDWIDE, ROSS KLEIN AND AMAR LALVANI,

        Defendants.

---

09 Civ. 3862 (SCR)

OPINION AND ORDER

**STEPHEN C. ROBINSON, United States District Judge.**

Defendants Hilton Hotels Corporation, n/k/a Hilton Worldwide ("Hilton"), Ross Klein ("Klein") and Amar Lalvani ("Lalvani") have filed a motion to dismiss the eleventh cause of action of the Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), and to dismiss the entire action for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

Plaintiff's Amended Complaint asserts both federal question and diversity of citizenship as independent grounds for subject matter jurisdiction. Defendants argue that neither provides a proper basis. They contend federal question jurisdiction is unavailable because the sole federal cause of action, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g) (the "CFAA"), fails as a matter of law. They also argue diversity of citizenship does not exist because both Starwood and one of the defendants, Amar Lalvani, were New York citizens at the time the action was commenced. Thus, Defendants argue that the Court should dismiss the action in its entirety.

In the alternative, if the Court retains jurisdiction over the case, Defendants argue that Starwood's first, third, and fourth causes of action are covered by the broad arbitration clause in Klein's separation agreement with Starwood and should be compelled to arbitration.

The Court finds that it has both federal question jurisdiction and diversity jurisdiction pursuant to 28 U.S.C. § 1331. Therefore, this Court denies the Defendants' motion to dismiss. Further, the Court finds that Starwood's first and third causes of action are exempt from Klein's separation agreement with Starwood, and compels only Starwood's fourth cause of action against Klein to arbitration.

## I.   BACKGROUND[1]

Starwood and Hilton are direct competitors in the hotel and resort industry, and both companies are hotel operators and franchisors around the world. Am. Compl. ¶¶ 1-3, 142. In 2008, Klein and Lalvani were executive officers at Starwood working on its luxury hotel brands. *Id.* ¶¶ 7, 146-147. In connection with their positions, Klein and Lalvani both "had access to the most confidential and competitively sensitive Starwood luxury and lifestyle brands information." *Id.* ¶¶ 146-147. Both Klein and Lalvani signed employment agreements with Starwood, including a "Non-Solicitation, Confidentiality and Intellectual Property Agreement." *Id*; Ex. 1 to Am. Compl. The confidentiality agreements provide that, upon termination of their employment with Starwood, they would return all Starwood confidential information and would not make or keep any copies, and that they would not disclose any Starwood confidential information to anyone. *Id.* ¶ 148; Ex. 1.

---

[1] The facts set forth in the Amended Complaint are presumed to be true for purposes of this motion, pursuant to Fed. R. Civ. P. 12(b)(6).

In February 2008, Christopher Nassetta, Hilton's President and Chief Executive Officer, began recruiting Defendant Klein to join Hilton. *Id.* ¶¶ 157-158. On May 16, 2008, unbeknownst to Starwood, Klein signed an employment agreement with Hilton. *Id.* ¶ 162. Klein did not inform Starwood that he had signed an employment agreement with a direct competitor. *Id.* Three days after he signed the employment agreement, on May 19, 2008, Klein informed senior executives at Starwood that he was resigning from the company. *Id.* ¶ 163. He still did not inform Starwood that he already had a signed employment agreement with one of Starwood's direct competitors, and he prepared for his departure to Hilton by requesting Starwood's confidential information from his staff and forwarding this material to his personal e-mail account. *Id.*

On May 30, 2008, Klein signed a separation agreement with Starwood. *Id.* ¶ 166; Ex. 3 to Am. Compl. At the time that Starwood agreed with Klein on the terms of the separation agreement, Starwood was unaware that Klein had already signed an employment agreement with Hilton two weeks earlier, or that he was already taking a large amount of Starwood confidential information home and sending materials to Hilton. *Id.* Klein's separation agreement included an arbitration clause which provides in part that "[a]ny controversy, dispute or claim arising out of or related to this Agreement or its enforceability shall be finally settled by final and binding arbitration." *Id.* at Ex. 3, ¶ 11.

Parallel to Nassetta's recruitment of Klein, in March 2008, Steven Goldman, President of Global Development & Real Estate at Hilton, began recruiting Lalvani to join Hilton. *Id.* ¶ 171. On or about March 9, 2008, Lalvani wrote to Goldman, following up on their communications: "Other idea is to bring over the core W team which has created an enormous amount of value and is very loyal to me to build a new brand for

you guys. Not sure your appetite but I know I could make that happen as well." *Id.* ¶ 172. Following these discussions, Lalvani also allegedly began to gather a large volume of confidential Starwood information in preparation for his move. *Id.* ¶ 173. While still a Starwood employee, Lalvani began to act as "a corporate spy" for Hilton, releasing to Goldman competitively sensitive confidential information related to Starwood's business and development opportunities. *Id.* ¶ 174. Lalvani did not leave Starwood until June 2008, when he became Global Head of Luxury & Lifestyle Brand Development at Hilton. Am. Compl. ¶¶ 179-180.

Starwood alleges that Klein and Lalvani stole hundreds of thousands of documents containing confidential Starwood information for Hilton's benefit. *Id.* ¶¶ 9, 15, 33, 111, 158-159, 161, 163, 173-76, 181, 196. Starwood further alleges that "Hilton, Klein, Lalvani, and others working in concert with them, have engaged in corporate espionage and the theft of highly confidential and proprietary Starwood information and trade secrets in breach of (or aiding the breach of) contractual and fiduciary duties in order to expedite Hilton's entry or expansion into new hotel markets, and substantially reduce its costs and risks of doing so." *Id.* ¶ 213. Hilton allegedly continues to use Starwood confidential information in head-to-head competition with Starwood. *Id.* ¶¶ 130, 198-214.

The allegedly unauthorized accessing of Starwood's computer systems and files and the theft of Starwood's confidential and competitively sensitive business plans and proprietary information were unknown to Starwood until February 2009. At that time, in connection with an arbitration against Klein, Hilton delivered to Starwood eight large boxes of computer hard drives, zip drives, thumb drives and paper records containing

massive quantities of highly confidential and proprietary Starwood files. *Id.* ¶¶ 111-112. On the computer drives Hilton returned to Starwood are over 100,000 files downloaded from Starwood computers. *Id.* ¶ 112. Starwood alleges, "Virtually every category of documents and information defined as Confidential Information in the Starwood employment agreements of Klein, Lalvani and the other Starwood employees recruited to join Hilton is contained in the materials found at Hilton and in the homes of former Starwood employees now working in management for Hilton." *Id.* ¶¶ 191-192.

Starwood commenced this action on April 16, 2009. On April 23, 2009, the Court entered a Preliminary Injunction and Order on consent, and the action was stayed until December 17, 2009. On January 14, 2010, Starwood served the instant Amended Complaint. Defendants Hilton, Klein, and Lalvani filed their motion to dismiss on February 26, 2010.

## II.   STANDARD OF REVIEW

In order to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (2009). "The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In evaluating a motion to dismiss, a court must "view all allegations raised in the complaint in the light most favorable to the non-moving party . . . and 'must accept as true all factual allegations in the complaint.'" *Newman & Schwartz v. Asplundh Tree*

*Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996) (quoting *Leatherman v. Tarrant County Narcotics Unit*, 507 U.S. 163, 164 (1993)) (citation omitted).

The Court is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Because the complaint must allege facts which confer a cognizable right of action, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *York v. Association of the Bar of City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 129 S.Ct. at 1950. Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action" do not suffice to state a claim, as "Rule 8 … does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1949-50. Furthermore, if allegations taken as true are consistent with plaintiff's claim, but there is an "obvious alternative explanation," the court will find that the plaintiff's claim is not plausible. *Twombly*, 550 U.S. at 567.

### III.   DISCUSSION

#### A. Federal Question Subject Matter Jurisdiction

Defendants argue that Starwood fails to state a CFAA claim for three reasons: (1) Starwood has not alleged facts sufficient to show unauthorized access; (2) Starwood has not alleged that Hilton personnel accessed a Starwood computer; and (3) Starwood cannot demonstrate "damage or loss" as required by the statute.

### 1. *Starwood has sufficiently alleged that Defendants accessed its computers "without authorization" or in "excess of authorized access."*

The CFAA provides a private federal cause of action against whoever:

> knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 10 year period,

18 U.S.C. § 1030(a)(4); and whoever:

> intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer,

18 U.S.C. § 1030 (a)(2)(C).

Defendants argue that Starwood has not, and cannot, allege facts sufficient to show unauthorized access because Defendants Klein and Lalvani were fully authorized to access Starwood's computers and electronic information. Starwood concedes that Klein and Lalvani "had access to the most confidential and competitively sensitive Starwood luxury and lifestyle brands information." *See* Am. Compl. ¶¶ 146-47. Defendants maintain that the case ends here; they argue that Starwood's allegations of *improper use* of the accessed electronic information are insufficient to demonstrate "unauthorized access" under the CFAA.

Starwood principally argues that the concept of "exceeds authorized access" may include exceeding the purposes for which access is authorized. *See* Pl. Mem. of Law in Opp'n at 8. Defendants focus their argument on the meaning of the word "authorization," arguing that Starwood's construction of the statute is inconsistent with

the plain meaning of the statute and the legislative intent articulated by Congress. *See* Defts' Mem. of Law at 11.

Although Defendants attempt to limit the reach of the CFAA, arguing that the CFAA is intended to address only computer hacking, other courts have given the CFAA a far broader scope. Under this broader view, the statute may encompass limits placed on the use of information obtained by permitted access to a computer system. *See United States v. John*, No. 08 Civ. 10459, 2010 WL 432405, at *2 (5th Cir. 2010). Three Circuits and at least one Second Circuit district court agree with Starwood that an employee who permissibly accesses his employer's data for an improper purpose, such as misappropriating it, violates the CFAA. *See John*, 597 F.3d at 273 (recognizing employee "exceeds authorized access" when she "knows that the purpose for which she is accessing information in a computer is both in violation of an employer's policies and is part of an illegal scheme"); *Int'l Airport Cts., LLC v. Citrin*, 440 F.3d 418, 420-21 (7th Cir. 2006) (noting that employee's misappropriation of confidential information violated his duty of loyalty, thereby "terminat[ing] his agency relationship ... and with it his authority to access the laptop"); *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 583 (1st Cir. 2001) (employee "exceeds authorized access by 'providing proprietary information' to an outside party in violation of employment agreement"); *Calyon v. Mizuho Sec. USA, Inc.*, No. 07 Civ. 2241, 2007 WL 2618658, at *1 (S.D.N.Y. Sept. 5, 2007).

Many other courts, however, have disagreed, holding that the CFAA's prohibition of improper "access" plainly does not encompass an employee's misuse or misappropriation of information that the employee lawfully accessed. *See Orbit One*

*Commc'ns, Inc. v. Numerex Corp.*, No. 08 Civ. 0905, 2010 WL 847133, at *8 (S.D.N.Y. Mar. 10, 2010) (collecting cases); *Jet One Group, Inc., v. Halcyon Jet Holdings, Inc.*, No. 08 Civ. 3980, 2009 WL 2524864, at *5 (E.D.N.Y. Aug. 14, 2009) (finding no CFAA violation where complaint asserted claim based on employee "misusing and misappropriating" confidential and proprietary information that he could access freely in the ordinary course of business).[2]

Most recently, the United States District Court for the Southern District of New York similarly construed the CFAA narrowly, observing that "reading the phrases 'access without authorization' and 'exceeds authorized access' to encompass an employee's misuse or misappropriation of information to which the employee freely was given access and which the employee lawfully obtained would depart from the plain meaning of the statute." *Orbit One Commc'ns, Inc.*, 2010 WL 847133, at *8.[3]

However, this case presents the Court with a factual scenario not yet addressed in the Second Circuit. This case does not deal with the outsider who hacks into a company's computer system to obtain information. Nor does it deal with the company insider who lawfully accesses the employer's information in the ordinary course of his duties and eventually uses that information against the employer's interests. Instead, this

---

[2] Both district court decisions note that, although the Second Circuit Court of Appeals has not yet squarely addressed the issue, the Second Circuit implicitly adopted the narrow view in a decision which interpreted the CFAA's "damage" and "loss" provisions. *See Orbit One Commc'ns, Inc.*, 2010 WL 847133, at *8-*9; *Jet One Group, Inc., v. Halcyon Jet Holdings, Inc.*, No. 08 Civ. 3980, 2009 WL 2524864, at *6 (citing *Nexans Wires S.A. v. Sark-USA, Inc.*, 166 Fed. Appx. 559, 562-563 (2d Cir. 2006). Specifically, the Second Circuit held that a plaintiff cannot recover "lost revenue" under the CFAA unless that lost revenue derives from an "interruption of service," upholding the district court's ruling that the plaintiffs could not recover revenue "lost as a result of defendants' use of their information to unfairly compete for business" where the defendants misappropriated the plaintiffs' proprietary information. *See Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 477 (S.D.N.Y. 2004). "The Second Circuit's decision therefore denies CFAA claimants a remedy for competitive harm suffered as a result of misuse or misappropriation." *See Orbit One Commc'ns, Inc.*, 2010 WL 847133, at *9.

is the case of "the corporate spy," a company employee who essentially perpetrates a fraud against the company by obtaining the employer's information under false pretenses. In this scenario, the employee has lawful access to the employer's information – but has obtained this access through trickery and deceit.

Although Defendants argue that "the sole allegations concern the alleged misuse of confidential information," *see* Defts' Mem. of Law at 9, Starwood alleges both that Klein and Lalvani misused the information while still employed by Starwood *and* that Klein and Lalvani accessed the confidential information after they became employed by Hilton. Lalvani did not inform Starwood that he was resigning until May 29, 2008, and his employment with Starwood did not end until June 14, 2008. *See* Am. Compl. ¶¶ 177-180. Starwood alleges that between March 9, 2008 and June 14, 2008, Lalvani was working for two employers, using his authorization to access and download Starwood's confidential information in order to take the materials with him for use in developing and marketing Hilton's brands. *See* Am. Compl. ¶¶ 172-181.

Plaintiff also alleges that after joining Hilton, Lalvani solicited and obtained additional Starwood confidential information from those with whom he had worked at Starwood and used Starwood confidential information for Hilton's benefit. Specifically, Plaintiff alleges that "Lalvani contacted Starwood employee Christopher Kochuba (whom he later recruited to Hilton) and asked Kochuba to send him 'all of [Starwood's] process maps, critical path, programs, designer lists, and other materials,' stating that he 'didn't bring a copy of that stuff and would be great to have.'" *Id.* ¶ 46.

Similarly, the Amended Complaint alleges that almost immediately after the CEO of Hilton began recruiting Defendant Klein to join Hilton in February 2008, "Klein

secretly misused his position as President of Starwood's Luxury Brands Group to request Starwood Confidential Information from Starwood employees, which Klein then forwarded to a personal e-mail account." Am. Compl. ¶¶ 157-158. Once Klein received a Hilton e-mail account, he then forwarded those Starwood materials from his personal e-mail account to his Hilton e-mail account. *Id.* ¶ 158. The complaint alleges that Klein also loaded Starwood confidential information onto a personal laptop computer and took more confidential information home with him in the form of hard-copy documents. *Id.*

Furthermore, the complaint alleges that "while he was under agreement to join Hilton and before he left Starwood," Klein asked his assistant and others who were unaware that Klein soon would be leaving Starwood to work for a competitor to digitally archive thousands of images that were used in the branding and design work completed for Starwood's luxury brands. *Id.* ¶ 161. After arranging for this digital imaging, Klein allegedly "arranged for the images to be sent to his personal e-mail account, where he was able to include them among the materials he brought to Hilton to assist Hilton in developing new Hilton brand identities, leveraging the techniques and tools taken from Starwood." *Id.*

After Klein joined Hilton, Klein allegedly "used Starwood employees as corporate spies to provide Hilton with even more Starwood Confidential Information concerning Starwood's ongoing business plans." The employees were "aware that doing so was a violation of their obligations to Starwood" and therefore "communicated secretly by personal e-mail accounts, stating to each other, for example: "fyi, I do not ck this email from work so it is ok to send stuff on." Am. Compl. ¶ 42.

Thus, unlike the case in which an employee lawfully accesses information on his employer's computer and later uses that information against his employer's interests, Klein and Lalvani accessed Starwood's confidential information with the very intention of transferring it to Starwood's direct competitor. The Amended Complaint alleges specific facts to demonstrate that both "Klein and Lalvani's access of Starwood's computer systems and transmission of electronic files to home addresses (and ultimately to Hilton) continued after they had accepted employment by Hilton for Hilton's benefit." *See* Pl. Mem of Law in Opp'n (citing Am. Compl. ¶¶ 42, 45, 46, 162-163, 178, 196). At that point, as employees of a direct competitor, Klein and Lalvani no longer had Starwood's authorization to access this information. Thus, even construing the statute narrowly to prohibit only accessing computer information without permission, Starwood's complaint adequately alleges a claim under the CFAA.

## 2. *Starwood was not required to allege direct access of its computers by Hilton personnel.*

Starwood's complaint alleges that Hilton, without any kind of authorization, accessed Starwood's computers through Klein and Lalvani, both while they were still employed by Starwood and after they became Hilton executives. The fact that Hilton personnel never directly accessed the computer themselves is not sufficient to dismiss the action. The actions of Klein and Lalvani were the acts of Hilton. *See Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 472 (S.D.N.Y. 2004) (imputing liability where plaintiffs alleged former employees "acted at the direction" of new employer); *see also Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 768 (N.D. Ill. 2009) ("Motorola has alleged in detail that Wu's unauthorized access was at the behest of an officer of Motorola's competitor, Lemko, and that Wu sent the files to Lemko through its chief

information officer."). The Amended Complaint alleges that Hilton used Lalvani, among other Starwood employees, as a corporate spy to steal confidential Starwood information. *See* Am. Compl. ¶¶ 41-42, 44-45, 174-175, 178. These allegations state a claim upon which relief can be granted under the CFAA.

### 3. *Starwood has adequately alleged "damage or loss" under the CFAA.*

Defendant contends that Starwood has not met the "damage or loss" requirement under the CFAA because the complaint fails to allege that Starwood suffered any computer inoperability or data impairment and because the requirement cannot be satisfied by Starwood's asserted business losses. *See Civic Ctr. Motors, Ltd. v. Mason St. Import Cars, Ltd.*, 387 F. Supp. 2d 378, 381 (S.D.N.Y. 2005) (citing *Nexans*, 319 F. Supp. 2d at 478 ("revenue lost because a defendant used unlawfully gained information to unfairly compete was not a type of 'loss' contemplated under the CFAA").

However, the statute defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense [including] conducting a damage assessment..." 18 U.S.C. § 1030(e); *see also Tyco International (US), Inc. v. John Does*, 2003 WL 21638205, at *1 (S.D.N.Y. July 11, 2003) (the CFAA "allows recovery for losses beyond mere physical damage to property [and includes] those costs necessary to assess the damage"); *Penrose Computer Marketgroup, Inc. v. Camin*, 2010 WL 335753, at *3-*4 (N.D.N.Y. Jan. 22, 2010). The CFAA requires a "loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value." 18 U.S.C. 1030(c)(4)(A)(i)(I)-(V).

The complaint alleges that by their wrongful actions, Defendants intentionally accessed Starwood's protected computer system without authorization, and as a result of

such conduct, caused Starwood damage and loss. Starwood alleges that the wrongful actions of Defendants have caused loss to Starwood that exceeds $5,000 in value during any one year period, in that Starwood has spent far in excess of $5,000 in responding to the offense and conducting a damage assessment. Am. Compl. ¶¶ 286-287. The complaint also alleges that Starwood's ongoing effort to determine exactly how much confidential material has been downloaded from Starwood's computer systems has taken considerable time and resources; the full extent of how the information may have been used by Hilton and the individual defendants is not yet fully known, but will become fully known through discovery in this action. Am. Compl. ¶ 191.

The Court concludes that these factual allegations are sufficient to state a claim for loss that is facially plausible and that Starwood "is entitled to offer evidence to support the claims." *York v. Association of the Bar of City of New York*, 286 F.3d 122, 125 (2d Cir. 2002).

### B. Diversity of Citizenship Jurisdiction

The Defendants also argue that diversity jurisdiction does not exist in this case. The complete diversity requirement under 28 U.S.C. § 1332(a) is satisfied if each plaintiff is a citizen of a different state from each defendant. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806). The question of whether diversity jurisdiction exists is determined by the citizenship of the parties when the action is commenced. If diversity jurisdiction exists at that time, it may not be divested by a subsequent move. *Renolds v. Wohl*, 332 F. Supp. 2d 654, 656 (S.D.N.Y. 2004). A person's citizenship for diversity purposes is determined by his domicile: "the place where he has 'his true, fixed home and

principal establishment, and to which, whenever he is absent, he has the intention of returning.'" *Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir. 1998).

Plaintiff maintains that at the time the action was commenced, Starwood was a citizen of Maryland and New York, Hilton was a citizen of Delaware and California, and Klein and Lalvani were citizens of California. *See* Am. Compl. ¶¶ 83, 89-92. Defendants argue complete diversity is lacking because, at the time this action was filed, Lalvani was a citizen of New York. *See* Defts' Mem. of Law at 20.

Lalvani was born and raised in California. *See* Lalvani Aff. ¶ 2. Lalvani's California birth domicile is "presumed to continue" until it is superseded by a new domicile. *See Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998) ("A domicile once acquired is presumed to continue until it is shown to have been changed.") (internal quotation marks and citations omitted). A party alleging a change in domicile must support that allegation with "clear and convincing evidence."[4] *Palazzo v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000). A change of domicile requires both (1) residence in the new domicile; and (2) the intent to remain there. *See, e.g., Linardos*, 157 F.3d at 948; *see also Boston Safe Deposit and Trust Co. v. Morse*, 779 F. Supp. 347, 349 (S.D.N.Y. 1991) ("Intent is the crux of the test because physical presence alone in a new location is insufficient to support a change of domicile.").

Although Lalvani states that he has considered New York to be his domicile since 2006, *see* Lalvani Aff. ¶ 1, Lalvani has resided in California with his family continuously since June 2008 and was residing there at the time this action was commenced. *See* Lalvani Aff. ¶ 18. Both Lalvani and his wife were also registered to vote in California,

---

[4] In contrast to Rule 12(b)(6), a motion challenging jurisdiction pursuant to Rule 12(b)(1) permits the Court to review and rely on evidence beyond the pleadings. *See Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 716-17 (S.D.N.Y. 2005).

not New York. Gilman Dec. ¶¶ 4, 12-13. When he registered to vote in California in September 2008, Lalvani signed an affidavit in which he swore under penalty of perjury that he met the eligibility requirements to vote in California. *Id.* ¶¶ 12, 14. The California Election Code provides that "[a] person entitled to register to vote shall be a United States citizen [and] resident of California," specifying that "'residence' for voting purposes means a person's domicile." Cal. Elec. Code §§ 2101, 349(a). Furthermore, the Code's definition of "domicile" is "that place in which his or her habitation is fixed, wherein the person has the intention of remaining, and to which, whenever he or she is absent, the person has the intention of returning" and that at any given time "a person may have only one domicile." *Id.* § 349(b). The Code's definition of "domicile" thus mirrors that of the Second Circuit for purposes of the diversity statute. *See Palazzo*, 232 F.3d at 42. Lalvani not only registered to vote in California, but also exercised his right to vote in the 2008 election, thereby affirmatively representing to California voting officials that California was his domicile.

Furthermore, Lalvani has not met his burden of demonstrating that he ever changed his California domicile. Lalvani has held a State of California driver's license continuously since he was originally licensed at age 16, and has renewed it repeatedly over the years, including during periods when he temporarily resided in New York and Brussels. *See* Lalvani Aff. ¶15. Lalvani's wife also held a California driver's license at the time this action was commenced, and holds a California driver's license currently. Finally, at the time the action was commenced, Lalvani was employed by Hilton at its Beverly Hills, California corporate headquarters, and his employment agreement with Hilton mandated that Lalvani would be located at Hilton's California headquarters "for a

minimum period of 12 months." *See* Lalvani Aff. ¶ 8, Ex. A at 1. Lalvani's employment agreement with Hilton also contemplated a possible relocation to London. *See id.*, Ex. A at 2.

Therefore, Lalvani has not put forth sufficient facts to demonstrate that he ever changed his domicile from California. Even though Lalvani did not sell his apartment in New York, he has not demonstrated an intent to remain there indefinitely, and in fact in his last "talent review" by Starwood in 2008 he stated that any future role in Starwood "must be international." Thus, as he has not established a new domicile, his birth domicile of California is presumed to continue.

### C. Arbitration

In the alternative, Defendants argue that the Court should compel claims relating to Klein's separation agreement with Starwood to arbitration. Defendants rely on the broad arbitration clause in the separation agreement: "Any controversy, dispute or claim arising out of or related to this Agreement or its enforceability shall be finally settled by final and binding arbitration conducted by a single arbitrator selected by the parties in accordance with the Employment Rules of the American Arbitration Association." Am. Compl. Ex. 3 at 4. Accordingly, they argue that Starwood's first, third, and fourth causes of action should be arbitrated. *See* Am. Compl. ¶¶ 218-26 (Breach of Contract); ¶¶ 233-241 (Inducing Breach of Contract; Tortious Interference with Contractual Relations); and ¶¶ 242-51 (Fraud; Aiding and Abetting Fraud).

Klein's Non-Solicitation, Confidentiality, and Intellectual Property Agreement with Starwood, a copy of which is attached to the complaint as Exhibit 1, explicitly excludes from arbitration "any Claims to the extent they involve the alleged taking, use

or disclosure of trade secrets and similar confidential or proprietary information." *See* Am. Compl. ¶ 146 and Ex. 1 at 6.

"Where the parties to an arbitration agreement *specifically have excepted a certain type of claim* from mandatory arbitration, it is the duty of courts to enforce not only the full breadth of the arbitration clause, but its limitations as well." *Hartford Accident & Indemnification Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) (citations omitted); *New York v. Oneida Indian Nation*, 90 F.3d 58, 59 (2d Cir. 1996) (holding that "the State's claim in this case is not subject to mandatory arbitration because the parties specifically excluded it from the general arbitration clause").

Starwood's first and third claims for relief relate to breach of the confidentiality and non-disclosure provisions of Klein's Non-Solicitation, Confidentiality, and Intellectual Property Agreement with Starwood, and are not directed toward a breach of the separation agreement itself. *See* Am. Compl. ¶¶ 218-26, 233-41. Because the parties specifically excepted this type of claim from arbitration, the Court concludes that the first and third claims for relief do not need to be arbitrated. However, the fourth claim for relief is for fraud, and relates to false representations made by Klein to Starwood in connection with his separation agreement. *See* Am. Compl. ¶¶ 242-51. As a "claim arising out of or related to this Agreement or its enforceability," this claim falls within the scope of the arbitration clause of the separation agreement. *See* Am. Compl. Ex. 3 at 4.

### IV.    CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is denied. Pursuant to Klein's separation agreement with Hilton, the fourth cause of action of the Amended Complaint for Fraud as against Klein is compelled to arbitration.

    The Clerk of the Court is directed to close docket entry 45.

*It is So Ordered.*

Dated: White Plains, New York

       June 16, 2010

                                        Stephen C. Robinson, U.S.D.J.